PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Putative Class

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSE CHAVEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BERLIN PACKAGING LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.: '26CV6361 GPC SBC<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. Violation of California Penal Code Section 631(a)** |

## I. INTRODUCTION

1. Berlin Packaging asked Jose Chavez whether he wanted advertisers to be able to track his interaction with them. He said no. Berlin recorded his answer, then shared his communications with advertisers and data brokers anyway. A privacy choice that does not change the tracking is a false choice.

2. The lie had a concrete result. As Chavez searched for bottles and considered a purchase, Berlin's code copied information about his shopping to outside advertising systems and connected it to persistent browser identifiers. His private shopping became advertising intelligence after he expressly refused that use. That completed intrusion is the injury.

3. In the fall of 2026, Chavez visited www.berlinpackaging.com, rejected nonessential cookies and tracking, clicked products, searched for "bottles," used "sauce bottles" form fields, and placed a 12-pack of sauce bottles in his cart without checking out. The technical examination of his visit documents advertising traffic after rejection, including StackAdapt page reporting, Microsoft Advertising activity, and Bidtellect/Simpli.fi tracking.

4. The consent record shows necessary cookies enabled and preferences, statistics, and marketing disabled. It also identifies the visitor's region as "us-06," California. Yet advertising requests continued to disclose meaningful page and search information linked to identifiers designed to recognize the same browser beyond a single page or session.

5. This action concerns the actual acquisition of those communications and Berlin's knowing assistance under California Penal Code section 631(a). The false privacy choice explains why the intrusion was unauthorized and offensive; the claim does not rest on a broken promise or an imperfect notice alone.

## II. PARTIES

6. Plaintiff Jose Chavez is a natural person and a citizen of California, domiciled in San Diego County. He was physically present in this District when he visited the Website and sent and received the communications at issue.

7. Defendant Berlin Packaging L.L.C. ("Berlin") is, on information and belief, a limited liability company organized under Delaware law with its principal place of business in Chicago, Illinois. Its published United States privacy policy identifies Berlin Packaging L.L.C. as the business operating the relevant platform. Berlin operates and controls www.berlinpackaging.com and its shopping, search, consent, and advertising integrations (the "Website").

8. Berlin markets and supplies packaging products, including bottles and containers, through its interactive online store. It solicits California customers, permits California visitors to search its catalog and build shopping carts, and offers shipment to California. Its published FAQ expressly addresses collection of sales tax on California shipments.

9. Chavez alleges his actions, rejection, and observations from personal knowledge. The technical allegations describe the expert examination of his visit. Allegations about Berlin's internal decisions, account relationships, historical deployment, and commercial arrangements are made on information and belief, based on the observed requests, consent record, configured advertising identifiers, published disclosures, and the functions of the deployed systems.

## III. SUBJECT MATTER JURISDICTION

10. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (5)(B), (6), and (10). Chavez is a California citizen. For CAFA purposes, Berlin is an unincorporated association and a citizen of Delaware, where it is organized, and Illinois, where it has its principal place of business. Minimal diversity exists.

11. On information and belief, the proposed Class contains more than 1,000 natural persons who experienced at least one qualifying acquisition of communication contents after rejecting advertising tracking during the year preceding filing. Its size exceeds the statutory requirement of 100 members. The estimate concerns people who experienced the challenged content-bearing disclosures, rather than all Website visitors or every cookie recorded.

12. That estimate rests on Berlin's established national online store, its large packaging catalog and customer reach, its deliberate service to California, and the common Website code and advertising configuration documented during Chavez's visit. Berlin publicly describes access to more than 50,000 packaging components and operations spanning more than 60 locations on four continents. Those business figures are not themselves a count of Class members; together with the continuously available store and shared tracking configuration, they support the good-faith inference of more than 1,000 affected California users over a year. Actual deployment dates and qualifying user counts are reflected in Berlin's consent, traffic, configuration, and advertising records.

13. The amount in controversy exceeds $5,000,000, exclusive of interest and costs. California Penal Code section 637.2(a) authorizes $5,000 for an actionable violation. One such award for each of 1,001 affected persons totals $5,005,000. This calculation does not multiply damages for every identifier, cookie, field, or network request, and it does not depend on future Class members. Chavez invokes CAFA, rather than federal-question jurisdiction merely because communications traveled over the Internet.

## IV. <u>PERSONAL JURISDICTION AND VENUE</u>

14. The Court has specific personal jurisdiction over Berlin under Federal Rule of Civil Procedure 4(k)(1)(A), California Code of Civil Procedure section 410.10, and due process. Berlin deliberately conducted the challenged Website operations on Chavez's device in California, recognized the California region in its consent system, and caused the outside advertising requests that invaded his privacy here.

15. Berlin's contacts arise from its own choices. It built and operated an interactive commercial store for California shoppers, delivered its shopping and advertising code to California devices, and maintained a consent interface that recorded California-specific location and tracking choices. California was an intended market served by those systems.

16. Berlin's public privacy policy includes a supplemental notice for California residents. It identifies Internet activity, identifiers, and consumer-profile inferences among information disclosed to advertising networks and describes advertising that follows Website visits. These disclosures demonstrate anticipation of California customers and commercial use of their online activity. They also connect the challenged collection to Berlin's advertising business purposes.

17. The technical record supplies a direct forum connection beyond those general commercial contacts. After Chavez rejected tracking, the Website stored a CookieConsent record with "necessary:true," "preferences:false," "statistics:false," "marketing:false," "method:explicit," and "region:us-06." The region designation identifies California. Thus, the system executing Berlin's chosen consent configuration recognized a California visitor and his explicit refusal while the challenged activity occurred.

18. On information and belief, that regional classification was available to Berlin through the consent platform it implemented and the record it caused to be stored. Berlin also received or caused its systems to process the network-address and request information accompanying the Website interaction. The allegation of forum knowledge rests principally on the recorded California classification, not merely on a claim that any website could theoretically locate any visitor.

19. Berlin nevertheless delivered and permitted the advertising integrations to operate on that California device. The post-rejection record includes StackAdapt content reporting with persistent advertising identifiers, Microsoft Advertising requests with page and search context, and Simpli.fi requests carrying an advertising identifier. Those requests

were generated through the Website's implementation while Chavez was communicating with the store.

20. Berlin selected or authorized the third-party tags, specified or approved the Website-specific tracking and campaign configuration, and supplied the pages and scripts that triggered the transmissions. The captured Microsoft request includes a Website tracking identifier, and the StackAdapt traffic includes conversion and tracking fields. These are configured commercial integrations, rather than a visitor's independent decision to send information to unrelated websites.

21. On information and belief, Berlin maintained the integrations to measure conversions, build or reach advertising audiences, attribute visits, and retarget interested shoppers. Its published policy describes tailoring advertising to users' interests and history and using outside advertising networks. Berlin therefore commercially benefited from the very California activity whose acquisition Chavez challenges.

22. A business may expressly aim its conduct at California by deliberately collecting and commercially exploiting information from devices it knows are located here. Differential treatment of California compared with every other State is unnecessary. Here, the California-region consent record, the deliberate code deployment, and the continuing advertising collection after an explicit refusal establish the relevant intentional forum conduct.

23. Chavez's claim arises out of and relates directly to those contacts. The California shopping interaction caused the store to execute Berlin's code; the code generated outside copies of information about that interaction; persistent identifiers connected the copies to a recognizable browser; and the invasion occurred during Chavez's use of his device in this District. The refusal and its recorded California context are part of the same transaction.

24. The connection does not depend solely on Chavez's residence or on the global availability of Berlin's Website. Nor does it depend on an advertiser later moving

information into California. Berlin affirmatively caused the disputed collection from the California device through the commercial implementation it controlled.

25. Exercising jurisdiction is reasonable. Berlin deliberately serves California purchasers and implemented systems recognizing California users. California has a substantial interest in protecting communications originating and received here and the privacy choices offered to its residents. Chavez resides here and experienced the intrusion here. The relevant scripts, consent records, and advertising records are electronic; Berlin's Illinois headquarters does not create an exceptional litigation burden. This forum permits efficient resolution of the common configuration and consent issues without an identified conflict with another sovereign's interests.

26. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events occurred in San Diego County: Chavez used the Website, expressly rejected tracking, and sent and received the shopping communications on his device here. The challenged code operated and generated the outside disclosures from that device in this District. San Diego County lies within the Southern District of California. 28 U.S.C. § 84(d).

## V. CHAVEZ REJECTED TRACKING AND CONTINUED SHOPPING

27. In the fall of 2026, Chavez was looking for sauce bottles and visited the Website. A box appeared offering a means to reject cookies and tracking. He selected rejection.

28. Chavez understood that choice to refuse the optional advertising tracking offered through the box. He did not understand it as a request merely to hide the box while leaving the rejected tracking active. He exercised the privacy choice Berlin presented before continuing his shopping.

29. After rejecting, Chavez clicked several items. He placed a product described as a "12 pack of sauce bottles" into his shopping cart without checking out. He typed "bottles" into the search bar and used "sauce bottles" form fields, then left the Website.

30. Those actions conveyed substantive messages to the store: the kind of container he sought, the products he wanted to inspect, and an item he was considering

purchasing. He intended to communicate those choices to Berlin to obtain search results, inspect products, and use the cart. He did not invite outside advertising platforms to acquire a contemporaneous record of that shopping.

31. Chavez did not complete a purchase or accept an agreement authorizing the challenged acquisition during the visit. He did not click to agree to arbitration or a class-action waiver in that interaction. His affirmative action concerning advertising tracking was rejection, and he did not later reverse it before the disclosures at issue.

32. After leaving, Chavez saw advertisements for some of the products he had clicked. Those observations are consistent with the recorded advertising implementation. His claim rests on the documented transmissions and identifying context, rather than on the later appearance of advertisements alone.

33. The expert examination documents what occurred during Chavez's visit: the explicit rejection was stored, but advertising traffic continued. The examination identifies the recipients, meaningful fields, cookie identifiers, and timing of the challenged collection.

## VI. <u>HOW THE OUTSIDE SYSTEMS ACQUIRED HIS COMMUNICATIONS</u>

34. Website communicates with a visitor's browser to display search results and products and respond to selections. Berlin supplied additional code that read information from that ongoing interaction and instructed the browser to send separate requests to advertising companies. In practical terms, the code added outside listeners to the shopping exchange.

35. The outside request could contain the address or title of the selected page, search information carried in an address, advertising-event information, and a persistent browser identifier. The destination address tells the browser where to send the request. A product address or search phrase carried inside that request tells the recipient what the visitor is seeking or viewing. The latter is the substance of a communication, not merely its route.

36. The report describes the third parties receiving duplicate interaction information contemporaneously with Chavez's communications with the Website. The code acquired page and search context during the live exchange and initiated the additional requests automatically. Chavez did not separately open an advertiser's website and choose to supply that information.

37. The transmission was caused by Berlin's deployed code and commercial configuration. Browser execution is how that configuration operated; it is not evidence that Chavez consented to the outside acquisition. The written consent record expressly documents the contrary choice.

**A. The consent record**

38. The stored cookie is labeled CookieConsent. Its decoded value records the categories and explicit method described above, including "marketing:false." It also records the California region. The report identifies the subsequent advertising requests as occurring after rejection of all nonessential and optional categories.

39. This record distinguishes a visitor who gave no answer from Chavez, who expressly answered no. It also supplies a technical basis to compare the rejected categories with the scripts that continued to transmit shopping information. The claim concerns that continued acquisition, rather than the mere storage of a consent-preference cookie.

**B. StackAdapt**

40. After rejection, the browser sent a request to tags.srv.stackadapt.com/conv. The report identifies StackAdapt as a registered data broker and describes the request as associating a visit with a persistent advertising profile. It carries page information and visitor identifiers for advertising attribution, conversion measurement, audience building, and retargeting.

41. The recorded fields include landing_url, a page-title field, a conversion or campaign identifier, a StackAdapt tracking token, is_js=true, source-related fields, shopping or conversion context, and multiple persistent sa-user-id values. These fields combine what a visitor was doing with a way to recognize the browser that did it.

42. The report documents page and search information in this advertising traffic. A search-results address carries its search_query value, while a product-page address identifies the selected product. During the visit at issue, the challenged acquisition included the substance of Chavez's bottle-related search and product browsing, linked to the advertising identifiers described here.

43. The cookie record includes sa-user-id, sa-user-id-v2, and sa-user-id-v4 entries associated with StackAdapt domains. The report describes third-party tracking cookies stored for 365 days. That duration is a configured persistence period, not a claim that a cookie by itself discloses an entire browsing history or proves a separate violation for every day it remains.

44. StackAdapt's role extended beyond rendering Berlin's products or keeping an item in Berlin's cart. Its conversion endpoint and persistent advertising identifiers associated the shopping event with an advertising profile for attribution and future audience recognition. On information and belief, it received and processed the disclosed shopping information for those advertising functions.

**C. Microsoft Advertising and Bing**

45. After rejection, the browser sent Microsoft Advertising requests through bat.bing.com/action. The displayed request contains a Website tracking identifier, a page-load event, page-title and page-address fields, a referring-page field, and identifying values. The page address identifies a selected product; the referring address carries search-results context in a search_query parameter.

46. These fields communicate more than the fact that some browser contacted Bing. The product title and address reveal the subject viewed, and a search-bearing referring address communicates the subject of a search that led to the product. The accompanying identifiers permit association of those subjects across events.

47. The report records a MUID cookie on a Bing domain and describes it as a persistent machine or browser identifier used for marketing and cross-website recognition, stored for approximately a year. The report explains that Microsoft can connect activity to

an account when the necessary account context exists. Chavez does not allege that he was signed into a Microsoft account or that a request carried his legal name or email address. The concrete identification alleged is the persistent browser association actually documented.

48. Microsoft's advertising system received page and search context from Chavez's visit while the shopping exchange was occurring. Its advertised and implemented role concerns behavioral advertising, measurement, and visitor recognition. The acquisition therefore supplied information to a separate advertising system, rather than merely creating Berlin's own internal record of a cart.

**D. Bidtellect and Simpli fi**

49. The post-rejection record also shows a request to tag.simpli.fi/sifitag with a Website-related identifier, a Berlin Website referrer, and a suid cookie identifier. The report places this activity in the Bidtellect/Simpli.fi advertising system and describes synchronization with advertising and data platforms.

50. That system uses cookie, device, network-address, and audience information to target, deliver, measure, and report advertising. The observed identifying traffic supports the allegation that Berlin connected the shopping interaction to an outside recognition and advertising network after rejection.

51. Chavez distinguishes that identifying function from the content-bearing page and search disclosures to StackAdapt and Microsoft. The Simpli.fi cookie or synchronization request alone is not pleaded as proof that every word typed into Berlin's Website was sent to Simpli.fi. It supplies additional evidence of the advertising architecture and Berlin's participation in that architecture.

**E. LiveRamp before consent**

52. Before consent, the report records a request to pippio.com/api/sync associated with LiveRamp, a registered data broker. It documents third-party cookies, including did, didts, nnls, and pxrc, and describes identity synchronization between LiveRamp and partner platforms.

53. This pre-consent activity identifies another part of the implemented identity infrastructure. Chavez does not treat it as proof that LiveRamp also continued after rejection, because the report distinguishes LiveRamp's pre-consent activity from the documented post-rejection recipients. The Class and claim pleaded here focus on actual content-bearing acquisition after an explicit rejection.

**F. Communication contents and contemporaneous acquisition**

54. The particular contents at issue are Chavez's bottle-related searches and selected product-page browsing during his November 2 visit. A search for "bottles" conveys a requested subject. The "sauce bottles" form use and the products he explored identify the purpose and context of that shopping. The selected 12-pack and uncompleted cart identify his purchase deliberation; the claim does not depend on an unsupported assertion that the entire cart or checkout record was transmitted.

55. The search and product information was associated with persistent advertising identifiers. The injury is that association: outside systems learned what this particular recognizable visitor was exploring after he rejected their collection. A homepage address or an unrelated cookie value in isolation would not establish the same acquisition.

56. The requests occurred as the browser communicated with the store, rather than only through a later transfer of a completed sale record. The scripts read the live page, search, or referral context and sent it to outside collection endpoints during the interaction. No purchase was necessary for that collection to occur.

57. Transport encryption does not authorize the challenged conduct. The code operating in the browser could read available page and search context and place it into a separate request before that request traveled to an advertising server. Chavez does not allege that a recipient broke encryption; he challenges the additional unconsented acquisition of readable communications.

58. A query string may contain the substance of a search or selected product. Calling it a URL parameter does not change what it tells the recipient. The contents

allegation rests on those meaningful fields and their context, rather than on screen dimensions, a timestamp, or a routing address alone.

## VII. THE PARTICULAR PRIVACY INJURY

59. Chavez had a reasonable expectation that he could send searches and product selections to the store without also authorizing advertising companies to acquire a linked record after he had expressly rejected that tracking. A public catalog describes products; it does not publicly announce which products this visitor privately considered or what he searched for.

60. His privacy interest concerns his own searches, browsing path, and uncompleted shopping decisions, connected to identifiers that allowed outside recipients to recognize the same browser again. Those are his private activities even though the products themselves are advertised to the public.

61. The disclosure was actual. StackAdapt received meaningful page and search context with persistent advertising identifiers; Microsoft received page and search-bearing referral context with browser-identifying information. The report documents the mechanisms and their post-rejection operation during his visit. The claim does not depend on speculation that every installed tag might someday transmit something.

62. The manner of collection made the intrusion highly offensive. Berlin offered an apparent means to refuse outside advertising tracking, recorded the refusal, and then operated an additional advertising audience during the ensuing interaction. Chavez reasonably continued shopping after exercising the choice Berlin supplied. The code defeated that choice without a later affirmative authorization.

63. The purpose and persistence reinforce the intrusion. The outside systems were configured for conversion attribution, advertising profiles, audience recognition, and retargeting, using identifiers stored for approximately a year. This converted an unfinished interaction with a chosen seller into information usable in an outside advertising environment after an express refusal.

64. The consent record and transmitted fields provide the particular facts: an explicit rejection, a California visitor designation, bottle-related shopping, page and search reporting, specified advertising recipients, and persistent identifier linkage. Chavez does not rely on an undefined "dossier," an unproved sale to the highest bidder, or an allegation that ordinary bottle purchases inherently disclose sensitive medical or financial information.

65. His harm is closely related to intrusion upon seclusion: an intentional and uninvited interference with private affairs in a manner highly offensive to a reasonable person. The relevant circumstances include the specific refusal, the substantive communications acquired, the outside advertising purposes, and the identifying persistence. These allegations describe the completed interference, rather than an abstract entitlement to a compliant banner.

66. The false choice explains the invasion. Chavez did what Berlin offered as the way to keep the additional audience out. Berlin's implementation supplied that audience anyway. The loss of the privacy he expressly chose to retain occurred when outside systems acquired the linked shopping information; a later public disclosure or financial loss is unnecessary to describe that injury.

67. This particularized intrusion is the deceptive collection identified by its contents, recipients, functions, timing, identifying context, and express refusal.

68. Berlin caused the injury by supplying, configuring, and maintaining the code that generated the outside requests during Chavez's visit. Without that implementation, those additional copies would not have been sent through the Website interaction. Statutory damages would redress the completed injury. This complaint seeks damages for past conduct and does not depend on standing to obtain prospective injunctive relief.

## VIII. <u>ABSENCE OF CONSENT AND KNOWING ASSISTANCE</u>

69. Chavez's rejection preceded the challenged post-rejection acquisitions. He did not subsequently accept the optional tracking, agree that advertising networks could

acquire the contents of his shopping communications, or invite them into the exchange. His use of the Website after rejection did not communicate the opposite of the explicit choice the Website had just recorded.

70. A posted privacy policy describing advertising technology does not establish that Chavez affirmatively agreed to its operation before the challenged acquisition. Nor does a general assertion that continued use signifies acceptance turn his recorded rejection into consent. The alleged permission required for the contents acquisition was absent when it occurred.

71. Berlin's published policy acknowledges outside collection over time, advertising networks, and uses connected to interests and browsing history. Its California notice separately recognizes choices about cross-context behavioral advertising. Those disclosures corroborate the commercial setting; Chavez does not bring a freestanding CCPA claim or rely on a notice defect as a substitute for an actual interception.

72. On information and belief, Berlin knowingly and intentionally selected or approved the tags and commercial configurations, authorized the recipients to receive the reported information, and maintained the triggers that operated after rejection. The Website-specific account fields, conversion settings, consent implementation, and repeated outside requests support that inference. The claim concerns deliberate deployment and assistance in contents collection, rather than an accidental connection or the mere appearance of a vendor name.

73. Berlin's role as the intended merchant recipient did not give it permission to bring an independent commercial listener into the communication. The recipients operated their own advertising endpoints and persistent identity systems, with the functions described above. The claimed outside acquisition was not simply a tool rendering a product page or remembering a cart exclusively within Berlin's ordinary shopping function.

## IX. CLASS ACTION ALLEGATIONS

74. Chavez brings this action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a California Rejection Class: All natural persons who, while physically present in California during the period beginning one year before filing this action through class certification, used www.berlinpackaging.com, expressly rejected nonessential advertising tracking through the displayed consent mechanism, and thereafter had substantive search or selected-product browsing information contemporaneously acquired through the challenged Website implementation by StackAdapt or Microsoft Advertising, associated with a persistent browser or advertising identifier, without subsequently authorizing that acquisition beforehand.

75. Generic homepage-only and identifier-only transmissions are excluded. Also excluded are Berlin; its officers and directors; the assigned judicial officers and their immediate families; persons acting solely as agents of Berlin in testing the implementation; and persons whose claims were finally adjudicated or fully released.

76. The Class is numerous. On information and belief, it exceeds 1,000 persons, for the reasons alleged in the jurisdiction section. Joinder is impracticable. Berlin's consent records, regional designations, versioned tag configurations, and advertising-event records can establish the relevant periods, content-bearing events, and consent states. Class size is not established merely by counting all Website visits.

77. Common questions include which advertising code Berlin deployed; what page and search fields it acquired and transmitted; whether the transmissions occurred during the shopping communications; how the recipients associated them with persistent identifiers; whether the rejection configuration prevented those transmissions; what Berlin knew and authorized; and whether that conduct violated sections 631(a) and 637.2.

78. Chavez's claim is typical. He used the same Website, selected rejection through its consent interface, and suffered a subsequent acquisition of meaningful shopping information linked to advertising identifiers through the challenged

configuration. The same commercial implementation and asserted failure to honor rejection underlie the Class claims.

79. Chavez will fairly and adequately protect the Class. His interest in establishing and remedying the unconsented acquisition aligns with the interests of other members. He has retained counsel experienced in consumer and privacy litigation. There is no known conflict that would prevent adequate representation.

80. Common questions predominate under Rule 23(b)(3). The central proof concerns shared code, recipient endpoints, meaningful transmitted fields, account settings, timing, consent handling, and persistent identifier functions. Class membership requires an actual qualifying disclosure after refusal, ensuring that the proposed Class addresses the completed injury rather than a technical violation alone.

81. Relevant differences in deployed versions, recipient systems, search and product fields, or consent handling can be addressed through appropriately limited periods, subclasses, or issue treatment under Rule 23(c)(4). Chavez does not seek a presumption that every cookie, every visitor, or every advertising request establishes an actionable contents acquisition or concrete injury.

82. A class action is superior. Repeated individual investigation of the same advertising code and consent configuration would impose substantial duplicated expense and risk inconsistent decisions. Common configuration and event evidence permit coordinated adjudication. Chavez is unaware of another proceeding that makes individual adjudication preferable. Notice and an opportunity to opt out will be provided under Rule 23(c)(2)(B), and counsel may be appointed under Rule 23(g).

## X. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of California Penal Code Section 631(a)

### On Behalf of Plaintiff and the Class

83. Chavez incorporates the preceding allegations and asserts this cause of action against Berlin for its own knowing participation and assistance in the acquisition described above.

84. California Penal Code section 631(a) prohibits, among other conduct, willfully and without the consent of all parties reading, attempting to read, or learning the contents or meaning of a communication while it is in transit, passing over a wire, line, or cable, or being sent from or received at a place within California. Its fourth clause prohibits aiding, agreeing with, employing, or conspiring with another to do the prohibited acts. Chavez principally alleges fourth-clause assistance in the recipients' second-clause contents acquisition.

85. Chavez and Class members sent communications to the Website through Internet infrastructure using wires, lines, and cables. Those communications originated from and were received on devices in California. The substantive communications included searches and requests to view selected products.

86. StackAdapt and Microsoft Advertising intentionally read, attempted to read, or learned the contents or meaning of those communications through the contemporaneous outside requests. The page, product, and search-bearing fields described above conveyed the subjects of the shopping exchange. Persistent identifiers connected that substance to the same recognizable browser.

87. The acquisition occurred while the shopping communications were being sent or received and during live interaction with the Website. The code copied the then-current page and search context and generated additional requests to the recipients. This was not merely the later review of an already-completed purchase record.

88. The recipients did not have all parties' prior consent. Chavez and Class members expressly rejected the additional advertising tracking before the qualifying disclosure and had not subsequently accepted it. Berlin's arrangement with an advertising company could not supply the visitor's missing permission.

89. Berlin knowingly aided, agreed with, or employed the recipients to carry out the acquisition by selecting or authorizing the advertising tags, supplying Website-specific tracking and campaign configuration, delivering the code to California devices, enabling page and search reporting with persistent identifiers, and maintaining operation after rejection. On information and belief, Berlin did so to obtain advertising, attribution, audience, and retargeting benefits.

90. Berlin's status as the store does not immunize its knowing assistance to an outside recipient. The separate recipient endpoints and advertising identity functions establish the additional acquisition alleged here. A business cannot supply the absent visitor's consent simply by configuring the browser to transmit a second copy.

91. The acts were willful: the code and settings were deliberately deployed to acquire and report the identified information for advertising purposes. On information and belief, Berlin and its recipients maintained that implementation with knowledge of its operation. The continued triggers after an explicit marketing rejection are documented in the technical record.

92. The conduct caused Chavez and Class members the actual, particularized privacy injury described above: outside advertising systems acquired meaningful shopping information associated with persistent visitor identity after an express refusal. That completed intrusion, and the manner in which it occurred, supply the concrete harm; statutory damages are a remedy for the harm rather than its substitute.

93. Under California Penal Code section 637.2(a), Chavez and Class members seek $5,000 for each actionable violation proved, or three times actual damages if greater. The number of actionable violations depends on the conduct established by the evidence. Chavez does not seek automatic multiplication for each cookie, technical field, or identifier within the same intercepted communication.

## PRAYER FOR RELIEF

Plaintiff requests judgment against Defendant as follows:

a. Certification of the Class under Federal Rule of Civil Procedure 23(a) and (b)(3), designation of Chavez as Class representative, and appointment of Class counsel under Rule 23(g);

b. A determination that the conduct proved violated California Penal Code section 631(a);

c. Statutory damages of $5,000 for each actionable violation proved, or three times actual damages if greater, under California Penal Code section 637.2(a);

d. Reasonable attorneys' fees under California Code of Civil Procedure section 1021.5 to the extent its requirements are satisfied, and recoverable costs of suit;

e. Prejudgment and postjudgment interest to the extent authorized by law; and

f. Such other and further relief as the Court deems just and proper.

Dated: November 8, 2026 PACIFIC TRIAL ATTORNEYS, APC

By:____________________________
Scott. J. Ferrell
Attorneys for Plaintiff and the Putative Class